# United States Tax Court

T.C. Memo. 2024-78

YA GLOBAL INVESTMENTS, LP f.k.a. CORNELL CAPITAL
PARTNERS, LP, YORKVILLE ADVISORS, GP LLC, TAX MATTERS
PARTNER AND YA GLOBAL INVESTMENTS, LP f.k.a. CORNELL
CAPITAL PARTNERS, LP, YORKVILLE ADVISORS, LLC, TAX
MATTERS PARTNER,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

YA GLOBAL INVESTMENTS, LP, YORKVILLE ADVISORS GP, LLC,
TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket Nos. 14546-15, 28751-15.                    Filed August 8, 2024.

————————

PS, a partnership, provided funding to portfolio companies in exchange for stock, convertible debentures, promissory notes, and warrants. Under its established accounting policies, PS stopped accruing interest on debentures and promissory notes when, in the opinion of its general partner, reasonable doubt existed as to the collectibility of the interest. PS wrote off previously accrued interest when it determined that payment by the debtor was unlikely. During 2009, PS accrued $17,137,938 of interest that it ended up writing off as an expense for the year. Also during that year, PS's general partner established foreign special purpose vehicles (Foreign SPVs)

[*2]  to facilitate the redemption of indirect interests in PS. Each Foreign SPV held participation interests entitling it to receive cash distributions as PS sold specified securities. On December 31, 2009, PS held stock, warrants, and convertible debentures issued by C, an Australian corporation in voluntary administration. On its financial statements, PS reported that its C convertible debentures were worth $148,269,798 on December 31, 2009. In an amended petition, Ps made the affirmative claim that PS was not required to have accrued for 2009 the $17,137,938 of interest that it later wrote off.

*Held*: PS was engaged in a U.S. trade or business during 2009.

*Held, further*, PS is required by I.R.C. § 475(a)(2) to recognize gain or loss as if each security it held on December 31, 2009, had been "sold for its fair market value" on that date.

*Held, further*, Ps have not established that any portion of the $148,269,798 value that PS assigned to its C convertible debentures was attributable to one or more assets that were not "securities" within the meaning of I.R.C. § 475(c)(2).

*Held, further*, if the participation interests held by the Foreign SPVs were contract rights to shares of the proceeds from the sale of specified securities owned by PS, those interests were capital interests in PS. *See* Treas. Reg. § 1.704-1(e)(1)(v).

*Held, further*, I.R.C. § 704(e)(1), as in effect for 2009, required that the owner of a capital interest in a partnership be recognized as a partner regardless of that person's subjective intent to participate in the partnership's business.

*Held, further*, because the record does not establish whether the participation interests held by the Foreign SPVs gave them undivided ownership interests in specified securities or instead were contractual rights to receive proceeds upon PS's sale of those securities, Ps have not met their burden of establishing that the Foreign SPVs were

**[*3]** not partners in PS during 2009. Therefore, PS's withholding tax liability under I.R.C. § 1446 for 2009 must take into account the items of partnership income, gain, loss, and deduction allocable to the Foreign SPVs.

*Held, further*, Ps have not established that, when PS accrued the $17,137,938 of interest it later wrote off for 2009, there was no reasonable expectation that the interest would ultimately be paid. PS's accrual of the interest indicates that, at the time of accrual, its general partner had not determined that reasonable doubt existed as to the collectibility of the interest. Ps have not identified any evidence unavailable to PS's general partner during 2009 that establishes that PS should have had no reasonable expectation of ultimately receiving the interest.

———

*Ellis L. Reemer*, *Henry C. Cheng*, *Tamara L. Shepard*, and *Caryn G. Schechtman*, for petitioners.

*Gretchen A. Kindel*, *Robert T. Bennett*, *Rebecca J. Kalmus*, *Charles E. Buxbaum*, *Shawna A. Early*, *Kelly M. Davidson*, and *Travis Vance III*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, *Judge*: In these cases, we review notices of final partnership administrative adjustment (FPAAs) in which respondent adjusted various partnership items reported by YA Global Investments, LP, a limited partnership (YA Global or the partnership) for the taxable years ended December 31, 2006, 2007, 2008, and 2009.[1] The FPAAs reflect respondent's determination that the partnership was engaged in a U.S. trade or business during those years and that, consequently, it was liable for withholding tax under section 1446[2] on the portion of its

---

[1] Respondent also issued FPAAs for the partnership's 2010 and 2011 taxable years but made no adjustment to its partnership items for those years.

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect for the years in issue, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect for those years, and Rule

[*4] taxable income effectively connected with that trade or business that was allocated to foreign partners. The FPAAs also determined that the partnership was liable for additions to tax under sections 6651(a)(1) and (2) and 6655 for its failure to file Forms 8804, Annual Return for Partnership Withholding Tax, and its failure to pay estimated taxes and section 1446 withholding tax.

In addition to assigning error to respondent's determination that YA Global was engaged in a U.S. trade or business during the years in issue, petitioners raised various issues regarding the manner in which respondent computed the partnership's section 1446 withholding tax liability. And petitioners challenged respondent's determinations of the additions to tax. Petitioners also alleged that the applicable statute of limitations barred respondent from assessing the tax and additions to tax in issue for 2006 and 2007.

In *YA Global Investments, LP v. Commissioner*, Nos. 14546-15 and 28751-15, 161 T.C. (Nov. 15, 2023), we addressed the issues that affected YA Global's taxable years ended December 31, 2006, 2007, and 2008. For the reasons explained in that opinion, we concluded that (1) the activities of Yorkville Advisors, the manager of YA Global's assets, were attributable to the partnership, (2) YA Global was engaged, through Yorkville Advisors, in the conduct of a U.S. trade or business during 2006, 2007, and 2008, (3) YA Global was required to recognize gain under the "mark-to-market" rule of section 475(a)(2) for each of 2006, 2007, and 2008, (4) all of YA Global's taxable income for 2006, 2007, and 2008 was effectively connected with its U.S. trade or business, (5) YA Global's liability for section 1446 withholding tax for 2007 and 2008 could not be "adjusted" under section 1464 to reflect stipulated expenses of YA Offshore Global Investments, Ltd. (YA Offshore), beyond its distributive share of partnership deductions, (6) YA Global's filing of Form 1065, U.S. Return of Partnership Income, for each of 2006, 2007, and 2008 did not commence the period of limitation on the assessment of section 1446 withholding tax for the year, and (7) YA Global is liable for additions to tax under section 6651(a)(1) and (2) for its failure to file Forms 8804 and pay section 1446 withholding tax.

references are to the Tax Court Rules of Practice and Procedure in effect for the relevant times.

**[\*5]**   Conference calls held with the parties' counsel on November 29, 2023, and February 22, 2024, identified the following issues that remain to be decided for YA Global's taxable year ended December 31, 2009:

1.   Whether the increase in the value of YA Global's interest in Compass Resources, Ltd. (Compass), during 2009 was attributable to securities subject to section 475's mark-to-market rules;

2.   Whether any of the items effectively connected with YA Global's U.S. trade or business for 2009 are properly allocated to foreign special purpose vehicles to which the partnership issued Schedules K–1, Partner's Share of Income, Deductions, Credits, etc., for that year;

3.   The value of accrued interest on convertible debentures held by YA Global on December 31, 2009, for the purpose of determining the partnership's mark-to-market gain or loss for the year under section 475(a)(2); and

4.   Whether YA Global was required to accrue for 2009 $17,137,938 of interest that it wrote off on its books.[3]

## FINDINGS OF FACT

*YA Global's Activities*

YA Global provided funding to portfolio companies in the form of convertible debentures, standby equity distribution agreements (SEDAs), and other securities. In a SEDA, YA Global committed to purchasing up to a specified dollar value of a portfolio company's stock over a fixed period, typically two years. The portfolio companies to

---

[3] In an Order issued December 1, 2023 (December 1 Order), we identified an additional issue related to YA Global's liability for additions to tax. The Supplemental Briefs that the parties submitted in response to that Order indicated that the parties' only disagreements regarding the additions to tax respondent determined were derivative of other issues. In regard to YA Global's 2010 and 2011 taxable years, shortly after trial, the parties stipulated:

> To the extent that YA Global is found to be engaged in a U.S. trade or business in 2006 through 2009, YA Global was also engaged in such U.S. trade or business in 2010 and 2011; in such case, YA Global's income and losses for 2010 and 2011 will be computed using the same methodology used to make adjustments to YA Global's Forms 1065 for 2006 through 2009 as shown in the FPAAs for those years.

[*6] which YA provided funds were generally small, microcap companies that would have been unable to receive funds from conventional sources such as commercial banks.

*Compass*

In November 2007, YA Global entered into a Series A Convertible Loan Agreement with Compass, an Australian company. Compass initially borrowed $25 million under that agreement and, in May 2008, borrowed an additional $11 million. Between April and December of 2008, Compass repaid about $13 million. On January 29, 2009, Compass entered into voluntary administration, and its stock was suspended from trading. In 2009, YA Global held Compass stock and warrants, in addition to convertible debt. On April 22, 2009, the administrator appointed in connection with Compass's voluntary administration prepared a 94-page "Circular to Creditors."

At a meeting of Compass shareholders held on June 17, 2010, YA Global, as one of the corporation's creditors, submitted a proposal to recapitalize the corporation. Under the proposal, YA Global would have received 2,263,267,330 new Compass shares in exchange for the debt Compass owed to YA Global on January 29, 2009, which was stated at approximately $35,538,068. The plan also called for YA Global to make additional advances of up to about $50 million. Another creditor, Coffee House, would have received 422,101,919 shares in exchange for the debt Compass owed to it, which was stated at approximately $37,798,404. The issuance of new stock to YA Global and Coffee House would have diluted the interests of existing Compass shareholders to about 5%.

Compass's administrators asked DMR Corporate Pty Ltd. (DMR) to prepare an independent expert's report evaluating YA Global's proposed recapitalization of Compass. DMR concluded that Compass "ha[d] a nil value" before the proposed recapitalization because "a substantial deficiency of net assets will result from both an orderly realisation of assets and from a liquidation of the assets."

According to the DMR report, "[u]nder the liquidation of assets valuation methodology, the Administrators estimate that [Compass] would have a deficiency of assets of $66,647,967." Compass's pro forma, postrecapitalization, balance sheet showed total liabilities of $42,421,199. As noted in the text, in the recapitalization, about $35,538,068 of debt held by YA Global and about $37,798,404 of debt held by Coffee House would be exchanged for newly issued Compass

[*7] stock.  Therefore, Compass apparently had total liabilities before the recapitalization of about $115,757,671 ($42,421,199 + $35,538,068 + $37,798,404).  The administrators thus determined that a sale of Compass's assets in liquidation would generate proceeds of about $49,109,704 ($115,757,671 − $66,647,967).

Neither the "orderly realisation" scenario nor the liquidation scenario valued Compass as a going concern.  According to the DMR report: "The orderly realisation of assets method estimates the fair market value by determining the amount that would be distributed to shareholders, after payment of all liabilities including realisation costs and taxation charges that arise, assuming the company is wound up in an orderly manner."  "The liquidation method," the report explained, "is similar to the orderly realisation of assets method except  the liquidation method assumes that the assets are sold in a short time frame."

In evaluating the fairness of the proposed recapitalization, however, DMR valued Compass as a going concern.  It accepted that, if Compass were valued as a going concern, its gross assets would be worth $113,250,000, substantially more than the $49,109,704 of proceeds that could be raised from a liquidating sale.  Thus, Compass's *net* assets, after the proposed recapitalization, would be $70,828,801 ($113,250,000 total assets less $42,421,199 remaining liabilities).[4]  DMR valued the existing shareholders' interests in Compass at $3,541,000 (roughly 5% of $70,829,000).  In other words, DMR determined that the same stock that would have been worthless in an "orderly realisation" or liquidation scenario would be worth about $3.5 million if Compass were maintained as a going concern, recapitalized in accordance with YA Global's proposal.  For that reason, DMR judged the proposed recapitalization to be fair.

YA Global's initial recapitalization proposal was approved by Compass's creditors but not by its shareholders.  YA Global then submitted a revised proposal that was approved by both Compass's creditors and shareholders.

*Special Purpose Vehicles*

Most investors in YA Global participated in the partnership through one of two "feeder" funds: YA Offshore and YA Global

---

[4] DMR viewed a net asset value of $70,829,000 as a "conservative estimate," and opined that, "in a best-case scenario," Compass's equity value "could be up to $20,000,000 higher."

[*8] Investments (U.S.), LP (YA Onshore).  U.S. investors owned their interests in YA Global through YA Onshore, and foreign investors held their interests in YA Global through YA Offshore.

YA Global's general partner established two special purpose vehicles (SPVs) at the end of each quarter during 2009, one for the benefit of investors in YA Onshore and another for the benefit of investors in YA Offshore.  The SPVs facilitated redemption requests made by the investors.  Each investor who sought redemption (of either its partnership interest in YA Onshore or its stock in YA Offshore) was given the option of receiving an in-kind distribution of securities or an ownership interest in one of the SPVs, which held "pro rata participation interests" in YA Global's securities.  The SPVs would receive cash distributions as YA Global liquidated its securities in the ordinary course of its business.

At trial, Oren Franks, YA Global's controller, explained that the SPVs gave withdrawing investors "a slice—their pro rata slice" of YA Global's existing securities.  The withdrawing investors, he said, "would no longer participate in new investments done by YA Global."

*Financial Reporting*

YA Global issued its 2009 financial statements in August 2010. (The auditor's report on those financial statements is dated August 13, 2010.)

YA Global's Consolidated Statement of Financial Condition as of December 31, 2009, reported the partnership's investments at fair value.  An explanatory note accompanying the partnership's financial statements includes an extensive discussion of how the partnership determined the fair value of its investments.  According to that note, convertible debentures, promissory notes, and other assets "for which no . . . market prices [were] available [were] valued at fair value as [YA Global's] General Partner . . . reasonably determine[d] in good faith."

YA Global accounted separately for accrued interest on debentures and promissory notes and the underlying instruments.  Its Consolidated Statement of Financial Condition as of December 31, 2009, lists "Investments" (including Convertible Notes and Debentures and

[*9] Promissory Notes) and "Interest Receivable" as separate assets.[5] The explanatory note describes the partnership's accounting for accrued interest: "The accrual of interest is discontinued when, in the opinion of the General Partner, there is reasonable doubt as to collectability. The Partnership also records a charge to operations for interest receivable that is written-off when management determines that payment by the debtor is unlikely."

The Schedule of Investments included in YA Global's financial statements for 2009 lists convertible debentures of Compass at a value of $148,269,798. That amount is the midpoint of a range of values for YA Global's interest in Compass as of September 30, 2009, determined by the financial advisory firm Valuation Research Corp. (VRC). In valuing YA Global's interest in Compass, VRC estimated Compass's enterprise value at $250.9 million to $306.9 million.

YA Global's Consolidated Statement of Financial Condition for 2009 reports a liability of $316,254,804 described as "Due to Special Purpose Vehicles." An explanatory note describes that amount as "[t]he fair value of the participating interests in the Partnership held by the SPVs . . . as of December 31, 2009." The partnership's 2009 Consolidated Statement of Changes in Partners' Capital reports withdrawals of $329,120,453. A footnote explains that that figure "[i]ncludes $277,044,686 of in-kind distributions . . . of participating interests in Special Purpose Vehicles."

YA Global's Consolidated Statement of Operations for 2009 reports an investment loss of $10,839,690, the excess of expenses of $56,716,169 over income of $45,876,479. The reported expenses include a $46,506,023 "[w]rite-off of interest receivable deemed uncollectible."

*Tax Reporting*

The Form 1065 that YA Global filed for 2009 reported a taxable loss of $125,568,354, consisting of $42,617,464 of interest, a short-term capital loss of $18,792,337, a long-term capital loss of $96,771,203, other income of $4,042,912, and other deductions of $56,665,190. By contrast, the partnership's loss per income statement for the year, as reported on line 26(a) of Schedule M–3, Net Income (Loss) Reconciliation for Certain Partnerships, Part II, was only $21,715,680. The partnership's loss per

---

[5] YA Global reported $34,581,418 of interest receivable as of December 31, 2009. By contrast, it reported $66,237,160 of interest receivable as of December 31, 2008.

**[\*10]** income statement reflected other income of $103,852,672 not taken into account for tax purposes. An explanatory statement identifies the other income as "Change in Unrealized Appreciation."

The "other deductions" of $56,665,190 that YA Global reported on line 13d of Schedule K, Partners' Distributive Share Items, of its 2009 Form 1065 include the same writeoff of interest receivable reported on YA Global's 2009 financial statements ($46,506,023), legal fees of $7,521,049, other professional fees of $1,602,188, and other investment expenses of $1,035,930.

YA Global issued Schedules K–1 for 2009 to, among others, YA Offshore and the following four SPVs: YA Offshore Global Investments SPV, Ltd., YA Offshore SPV 309, Ltd., YA Offshore SPV 609, Ltd., and YA Offshore SPV 909, Ltd. (collectively, Foreign SPVs). The Schedule K–1 issued to each Foreign SPV identified it as a foreign corporation.[6]

The Schedules K–1 issued to the Foreign SPVs reported allocations to them of each item of income, loss, and deduction shown on YA Global's Schedule K. Those schedules also reported the Foreign SPVs as having substantial capital accounts in YA Global at the end of 2009: YA Offshore Global Investments SPV, Ltd. had a capital account of $47,615,923, YA Offshore SPV 309, Ltd.'s capital account was $114,757,093, YA Offshore SPV 609 Ltd.'s capital account was $35,106,274, and YA Offshore SPV 909's capital account was $8,709,758.

*Writeoff of Accrued Interest*

Petitioners provided a schedule to respondent (included in the record as Exhibit 1290-P) "to show information used to compute YA Global's interest write off for 2009."[7] Exhibit 1290-P shows interest accrued and written off on 98 debentures and promissory notes issued by 34 different issuers. Those issuers are Access Beverage, Inc. (Access Beverage), BlueCreek Energy, Inc., Cobalis Corp. (Cobalis), Compass, Corporate Strat, CSI Business, Earth Biofuels, Inc. (Earth Biofuels), EYI Ind., Falcon Natural Gas Corp. (Falcon), Futuremedia PLC

---

[6] YA Global also issued a Schedule K–1 to an entity named YA Offshore SPV 1209, Ltd., which the schedule identifies, perhaps erroneously, as a domestic corporation. But the Schedule K–1 issued to YA Offshore SPV 1209, Ltd., lists that entity's share of each item of YA Global's income, loss, and deduction as zero.

[7] The amount shown on Exhibit 1290-P as interest written off is $99 less than the $46,506,023 that YA Global reported on its financial statements and on its tax return.

**[*11]** (Futuremedia), Handheld Entertainment, Inc. (Handheld), Ignis Petroleum Group, Inc. (Ignis Petroleum), Innova Holdings, Inc., Isonics Corp. (Isonics), iVoice Technology, Inc. (iVoice), KD Resources, Macmin Silver Limited, MM2 Group, Inc. (MM2), Natural Nutrition, Inc., Newgen Tech., NS8 Corp., Pacific Gold Corp. (Pacific Gold), Poseidis, Inc. (Poseidis), PNG Ventures, Inc., Renewable Fuels, Inc., Speech Switch, Inc., Techlabs Inc., Teleplus World Corp. (Teleplus), Terminal 1, Titan Global Holdings, Inc. (Titan), TXP Corp., United Fiber Systems, U.S. Helicopter Corp. (US Helicopter), and Wherify Wireless, Inc. (Wherify). The interest that YA Global both accrued and wrote off for 2009 did not include interest on any debenture or promissory note issued by McKenzie Bay International, Ltd., Savi Media Group, Inc., or the Certo Group Corp.

Respondent stipulated that petitioners provided him with Exhibit 1290-P but did not stipulate the amounts shown on the schedule. The amounts in the "2009 Write Off" column of Exhibit 1290-P sum to $46,505,924. Another column purports to identify the portion of the amount written off that accrued in 2009. The amounts in that column sum to $17,137,938.

*Cobalis*

YA Global accrued and wrote off interest for 2009 on two debentures issued by Cobalis. It accrued interest on each debenture in January and then wrote off all accrued interest in February.

An order issued by the Securities and Exchange Commission on July 26, 2011, revoked the registration of Cobalis's securities. The order notes that the auditors' report included with the registration statement filed by Cobalis's predecessor in 2002 expressed doubt about the company's ability to continue as a going concern. The auditors also included going concern qualifications in the financial statements of Cobalis and its predecessor for 2004 through 2007.

On August 1, 2007, YA Global filed an involuntary bankruptcy proceeding against Cobalis. On August 31, 2009, Cobalis filed a bankruptcy plan in which it proposed to repay its debt using revenue from product sales and the sale of its common stock.

*Compass*

YA Global accrued and wrote off interest for 2009 on two debentures issued by Compass. On one of those debentures, the

[*12] partnership accrued interest for each month from January through May, accrued no interest for June or July, wrote off most of the accrued interest in August, and wrote off the remainder of the accrued interest in November. On the other debenture, the partnership again accrued interest each month from January through May, accrued no interest for June, July, or August, wrote off most of the accrued interest in September, and wrote off the remainder of the accrued interest in November.

### Isonics

YA Global both accrued and wrote off interest for 2009 on three debentures and three promissory notes issued by Isonics. YA Global accrued interest on each instrument for each month from January through November. On one of the debentures, it received a $600,000 payment of interest in March.

A Form 10–Q (the quarterly report under Section 13 or 15(a) of the Securities and Exchange Act of 1934) filed by Isonics for the quarter ended October 31, 2008, noted that Isonics had working capital and stockholders' deficits at the end of the quarter. It noted that the company might not be in compliance with covenants made in connection with its issuance of convertible debentures and term notes. Those conditions, the company reported, "raise[d] substantial doubt about [its] ability to continue operations as a going concern." In fact, the auditors' report on the company's financial statements for the year ended April 30, 2008, included a going concern qualification. Isonics's cashflow from operating activities was −$815,000 for the six months ended October 31, 2007, and −$1,211,000 for the six months ended October 31, 2008.

### iVoice

YA Global both accrued and wrote off for 2009 interest on a debenture issued by iVoice.[8] The partnership accrued interest on that debenture for each month from January through May 2009. It accrued no interest from June through October. It then wrote off the accrued interest in November.

According to Form 10–K (the Annual Report Pursuant to Section 13 or 15(d) of the Securities and Exchange Act of 1934) for the year

---

[8] The partnership also wrote off in November 2009 interest that had accrued as of December 31, 2008, on another iVoice debenture. The partnership did not accrue any interest on that other debenture for 2009.

[*13] ended December 31, 2008, filed by iVoice Technology, Inc. (iVoice Technology), a subsidiary of iVoice, iVoice Technology's auditors included a going concern qualification in its reports on the company's financial statements for both 2007 and 2008. The going concern qualification included in the company's 2007 financial statements was attributed to, among other things, its "historical negative cash flow." The going concern qualification for 2008 was based, among other things, on the company's negative cashflow from operations and negative working capital.

A Form 10–Q filed by iVoice for the quarter ended September 30, 2009, also refers to "substantial doubt about the Company's ability to continue as a going concern." That doubt was attributed to the company's "substantial accumulated deficits," its "obligation to deliver an indeterminable amount of common stock due on derivative liabilities," and its completion of "the process of spinning out . . . five operating subsidiaries." The company had spun off three of the five operating subsidiaries in 2005 and, since then, had "transitioned itself into a company focused on the development and licensing of proprietary technologies."

A Form 10–K for the year ended December 31, 2009, filed by B Green Innovations, Inc. (B Green), the successor to iVoice Technology, states that the company's auditors had, again, included a going concern qualification in their report on the company's financial statements for the year. The issues cited by the auditors for their 2009 going concern qualification were the company's "net loss," its "negative cash flow from operations," and its "negative working capital."

*MM2*

YA Global accrued and wrote off interest for 2009 on two debentures issued by MM2. For each debenture, the partnership accrued interest each month from January through November and then wrote off all accrued interest in December.

The statements of cashflow included in the Form 10–Q filed by MM2 for the quarter ended March 31, 2009, report that the company's cashflow from operations was −$298,826 for the nine months ended March 31, 2008, and −$89,233 for the nine months ended March 31, 2009. The Form 10–Q also notes that the company was "in default of the repayment terms" of a convertible debenture it issued to YA Global in 2006. As of the date of the filing of the Form 10–Q, YA Global had

[*14] "not demanded payment" on the debenture and MM2's "management [was] in negotiations to restructure the debt." The Form 10–Q also stated that the company's "recurring losses" and "deficiencies in cash flow from operations . . . raise[d] substantial doubt about [its] ability to continue as a going concern."

### Titan

YA Global accrued and wrote off interest for 2009 on a debenture issued by Titan. The partnership accrued interest on the debenture for each month from January through November of 2009 and then wrote off the accrued interest in December.

The Consolidated Statements of Cash Flows included in a Form 10–Q that Titan filed for the quarter ended November 30, 2008, report that Titan's cashflow from operations was −$8,758,000 for the three months ended November 30, 2007, but was $5,744,000 for the three months ended November 30, 2008.

*November 24, 2009, Meeting of Yorkville Advisors' Investment Committee*

At a meeting of Yorkville Advisors' Investment Committee held on November 24, 2009, the committee reviewed positions held by YA Global and agreed to write down specified positions as of December 31, 2009. Among other things, the committee agreed to write down 50% of YA Global's position in Access Beverage, 20% of YA Global's position in Cobalis, 25% of its position in Isonics, 50% of its position in MM2, 25% of its position in Poseidis (in addition to a 20% writedown previously taken), 50% of its position in Speech Switch, 50% of its position in Titan, and 30% of its position in US Helicopter.

*FPAA*

The 2009 FPAA determined that YA Global had ordinary business income of $24,790,341. That amount is the partnership's overall loss for the year computed without regard to the interest writeoff and increased by the change in unrealized appreciation reported on line 26(d) of Part II of the partnership's Schedule M–3 (−$125,568,354 + $46,506,023 + $103,852,672 = $24,790,341). The FPAA describes the

**[\*15]** interest writeoff deduction as having been disallowed because it had "not been substantiated or shown to be allowed under I.R.C. § 166."[9]

The 2009 FPAA determined that YA Global owed section 1446 withholding tax for the year of $6,748,616.  In computing that amount, respondent determined that all of the partnership's ordinary business income was effectively connected taxable income (ECTI).  In determining YA Global's section 1446 liability for 2009, respondent took into account the portion of YA Global's ECTI allocable to YA Offshore and the Foreign SPVs.[10]

## OPINION

I.  *Treatment Under Section 475 of YA Global's Interest in Compass Resources*

Section 475(a) provides rules regarding the treatment of "securities" held by a "dealer in securities."  Section 475(a)(1) requires that securities included in the dealer's inventory be valued at their fair market value.  Section 475(a)(2) provides:

> In the case of any security which is not inventory in the hands of the dealer and which is held at the close of any taxable year—
>> (A)  the dealer shall recognize gain or loss as if such security were sold for its fair market value on the last business day of such taxable year, and
>> (B)  any gain or loss shall be taken into account for such taxable year.

For purposes of section 475, the term "security" includes "any . . . share of stock in a corporation," § 475(c)(2)(A), any "note, bond, debenture, or other evidence of indebtedness," § 475(c)(2)(C), and any warrant to acquire stock, § 475(c)(2)(E).

---

[9] Section 166(a)(1) allows a deduction for "any debt which becomes worthless within the taxable year."  Section 165(a) allows a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise."  Deductions in respect of debt instruments that are evidenced by securities are governed by section 165 rather than section 166.  *See* § 166(e).  Petitioners contend that YA Global's convertible debentures were "securities" within the meaning of section 165(g)(2).

[10] Respondent concedes that "YA Global is not liable for any section 1446 tax with respect to [YA Offshore] SPV 1209, Ltd."

**[\*16]** In our prior opinion, we concluded that YA Global was a "dealer in securities," as defined by section 475(c)(1), and thus was subject to the mark-to-market rule provided in section 475(a)(2). We also concluded that petitioners had not demonstrated that any of the securities YA Global held at the end of 2006, 2007, or 2008 qualified for an exception from the mark-to-market rules for securities identified as being held for investment. *See* § 475(b)(1)(A), (2). Petitioners offer us no reason why those conclusions do not apply equally to the partnership's 2009 taxable year. It follows that, under section 475(a)(2), YA Global is required to recognize gain or loss as if each security it held on December 31, 2009, had been "sold for its fair market value" on that date.

Petitioners contend that the $103,852,672 Change in Unrealized Appreciation reported on Schedule M–3 of YA Global's 2009 Form 1065 includes "an unrealized gain of over $116,308,517 that was associated with YA Global's investment of [sic] Compass Resources, Ltd." "But for the inclusion of [that] unrealized gain," petitioners allege, "the total unrealized amount for 2009 would have been a comparatively modest *loss* . . . rather than a gain." Petitioners argue:

> Respondent's inclusion of the $116.3 million unrealized gain associated with Compass was in error because . . . that unrealized gain was not attributable to any security that YA Global held. Rather, it was an amount recorded on YA Global's books to account for the value associated with the *likelihood* that YA Global *would be entitled* to enter into a *new* funding arrangement with Compass that would render the Fund [that is, YA Global] a controlling shareholder in the company.

Petitioners' argument rests on DMR's determination that Compass had a nil value before the proposed recapitalization. If the Compass stock was worthless, petitioners reason, the warrants YA Global held to acquire Compass stock "were also worthless." And the partnership's right to convert its Compass debentures into stock "was also worth zero." If the conversion privilege were worthless, "[t]he debt could not possibly be worth more than its face value." Petitioners conclude: "The value of the interest that the Fund held in Compass was therefore not attributable to any security at all. Rather, the interest that VRC valued was merely the potential that the Fund would be entitled to acquire stock of Compass as part of the recapitalization of the company if that transaction were approved."

**[\*17]** Respondent argues that "[n]othing in the record . . . establishes how YA Global calculated the [\$103,852,672] shown on the 2009 Schedule M–3 or whether the unrealized gain of \$116,308,517 attributable to Compass Resources was included in this calculation." Moreover, even assuming arguendo that "petitioners could show that the Section 475 Adjustment took into account an unrealized gain of approximately \$116 million with respect to Compass Resources," respondent disputes petitioners' claim that the gain was not attributable to a security. Respondent observes that petitioners' position is "inconsistent with YA Global's own financial reporting." He argues that petitioners "have not provided evidence to establish that the unrealized gain attributable to Compass Resources was for anything other than" the convertible debentures that YA Global reported on its 2009 financial statements.

Petitioners' argument rests on an invalid premise. DMR concluded that Compass's equity would have "a nil value" if Compass were valued on either an "orderly realisation" or liquidation method. But the DMR report, in judging the proposed recapitalization as fair, established that Compass was worth more as a going concern than as a pool of assets to be liquidated either in a "short time frame" or "an orderly manner." The conclusion petitioners draw from the DMR report, that the Compass stock was worthless, would be valid only if an orderly realization of assets or prompt liquidation would produce more value for stakeholders than continuing Compass as a going concern. The DMR report itself establishes the invalidity of that premise.[11]

We understand that petitioners might be reluctant to accept the possibility that YA Global overstated the value of its interest in Compass on the partnership's 2009 financial statements. With their insistence that the partnership's interest in Compass was worth no less than the \$148,269,798 that YA Global reported as the value of its Compass convertible debentures, however, petitioners have backed themselves into a corner. The simultaneous acceptance that (1) YA Global held an interest in Compass as of December 31, 2009, worth \$148,269,798, and (2) only \$31,961,281 of that value (\$148,269,798 −

---

[11] If Compass's assets were worth \$113,250,000, a value that the DMR report accepted as a conservative estimate, Compass would have been insolvent before the recapitalization even if the company were valued as a going concern. The value of Compass's assets would have been less than its \$115,757,671 of liabilities. But DMR determined that Compass's assets could have been worth up to \$20 million more than \$113,250,000. If so, Compass would not have been insolvent and its stock would have had positive value before the recapitalization.

[*18] $116,308,517) was attributable to securities reflects a logical contradiction. The proposed recapitalization would have entitled YA Global to receive new Compass stock in exchange for its pre-recapitalization interest in Compass. If that interest consisted of securities worth $31,961,281 and some other asset worth $116,308,517, what happened to that other asset? If it simply disappeared in the recapitalization, it cannot have been a real asset. And viewing YA Global as having received new Compass stock in exchange for the expectation of receiving new Compass stock would be tautological: The mere expectation of receiving something cannot be consideration for its receipt.

In sum, the differences between the VRC and DMR reports do not identify any nonsecurity interests in Compass that YA Global held at the end of 2009. Instead, the differences reflect different judgments as to Compass's enterprise value.[12] But petitioners have not asked us to resolve that difference. Instead, consistent with YA Global's financial reporting, petitioners accept that the partnership's interest in Compass was worth $148,269,798 as of December 31, 2009. The question for us to resolve is whether petitioners have met their burden of proving that any portion of that value was attributable to one or more assets that were not "securities" within the meaning of section 475(c)(2).[13] For the reasons explained above, petitioners have not met that burden.

---

[12] The valuation assumptions underlying the DMR report indicate that the value of YA Global's interest in Compass at the end of 2009 could not have been more than about $72.6 million. The issuance of new stock to YA Global under the proposed recapitalization would have given it an 80% interest in Compass. If, as DMR determined, Compass's net assets in a "best-case scenario" were worth no more than $90,829,000, then YA Global's interest in Compass, post recapitalization, would have been worth no more than about $72.6 million ($90,829,000 × .8). We assume that YA Global would not have proposed a recapitalization of Compass that reduced the value of its interest in the company. Petitioners, however, do not argue that YA Global's interest in Compass as of December 31, 2009, was worth less than the $148,269,798 it reported on its financial statements as the value of its Compass convertible debentures. Instead, petitioners argue that most of that value was attributable to one or more assets that were not "securities" within the meaning of section 475(c)(2).

[13] Rule 142(a)(1) provides: "The burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court; and except that, in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer, it shall be upon the respondent." None of the exceptions applies to the issues addressed in this Opinion.

**[\*19]** II.    *Allocation of ECTI to Foreign Special Purpose Vehicles*

A.    *Background*

Section 1446(a) requires a partnership to pay a withholding tax on any ECTI allocable to a foreign partner.  Section 1446(b)(1) provides that "[t]he amount of the withholding tax payable by any partnership under [section 1446(a)] shall be equal to the applicable percentage of the effectively connected taxable income of the partnership which is allocable under section 704 to foreign partners."   The "applicable percentage," in respect of any foreign partner, is the highest rate of tax specified in either section 1 or section 11(b)(1), depending on whether the foreign partner is a corporation.  § 1446(b)(2).  The term "effectively connected taxable income" generally refers to "the taxable income of the partnership which is effectively connected (or treated as effectively connected) with the conduct of a trade or business in the United States." § 1446(c).

In our prior opinion, we concluded that petitioners had failed to meet their burden of proving that YA Global was not engaged in a U.S. trade or business during 2006, 2007, and 2008.  Again, petitioners offer us no reason why that conclusion does not apply equally for the partnership's 2009 taxable year.

Under section 1461, withholding agents are personally liable for the tax they are required to deduct and withhold under chapter 3 (sections 1441 through 1464).  If the recipient of the income subject to withholding pays the tax against which the withholding tax could be credited, however, the withholding agent is relieved of liability for withholding tax but not "for interest or any penalties or additions to the tax otherwise applicable in respect of [the withholding agent's] failure to deduct and withhold."  § 1463.

Treasury Regulation § 1.1446-3(e)(1) applies the principle of section 1463 to the specific case of partnership withholding under section 1446:

> [A] partnership that is required to pay 1446 tax but fails to do so, or pays less than the amount required under this section, is liable under section 1461 for the payment of the tax required to be withheld under chapter 3 of the Internal Revenue Code and the regulations thereunder unless, and to the extent, the partnership can demonstrate pursuant to paragraph (e)(2) of this section, to the satisfaction of the

[*20] Commissioner or his delegate, that a foreign partner has paid the full amount of tax required to be paid by such partner to the Internal Revenue Service.

A partnership seeking to rely on the exemption from liability must "provide sufficient information to the IRS [Internal Revenue Service] to determine that the partner's tax liability was satisfied or established to be zero." Treas. Reg. § 1.1446-3(e)(2).

In his Reply Brief, respondent conceded that YA Offshore had nonpartnership expenses for 2009 sufficient to offset its share of YA Global's ECTI. Accordingly, respondent conceded that, under Treasury Regulation § 1.1446-3(e), YA Global had no section 1446 withholding tax liability for 2009 in respect of YA Offshore. In that Brief, however, respondent observed that petitioners had "made no arguments asserting that any foreign partner, other than YA Offshore, paid its income tax liability or had zero tax liability." Respondent viewed petitioners as having "conceded, therefore, that YA Global is liable for the section 1446 withholding tax attributable to YA Global's other foreign partners for 2009."

In an Order issued August 12, 2022, we posed questions to the parties that we expected them to be prepared to address at a remote Special Session scheduled for August 31, 2022. Among our questions for petitioners were the following:

Do petitioners agree that, during 2009, YA Global had partners other than YA Offshore who were either foreign or from whom the partnership did not receive withholding certificates under Treasury Regulation § 1.1446-1(c)(2)? If so, do petitioners concede that, should the Court determine that YA Global was engaged in a U.S. trade or business during 2009, the partnership would be liable for withholding tax under section 1446 on the portion of its ECTI allocable to those other foreign (or deemed foreign) partners?

Because we did not have sufficient time at the August 31 Special Session to address all the questions we had for the parties, we scheduled another remote Special Session for September 16, 2022. At the September 16 Special Session, we asked petitioners' counsel whether, "if we determine that YA Global was [in] a U.S. trade or business in 2009, the partnership would owe some withholding tax liability in regard to

[*21] those foreign partners other than YA Offshore." Petitioners' counsel responded: "Technically, I think it is correct. . . . I think technically [the Foreign SPVs] were partners, and I can't think of any good reason around it. So I'm going to say yes."

Following the September 16 Special Session, we issued an Order (September 20 Order), directing the parties to submit written reports addressing the questions discussed during that session. In the report petitioners submitted in response to the September 20 Order (November 16 Report), petitioners asserted that the Foreign SPVs "were not partners in any ongoing business of the Fund, and even if they were technically members of the partnership, they would not have had effectively connected taxable income . . . allocable to them under section 704." "[B]y their very nature," petitioners argued, the Foreign SPVs "were not in a continuing partnership with the other investors in YA Global." They were "merely co-owners of illiquid assets, not partners in any continuing venture." "Even if the [Foreign] SPVs could somehow be viewed as partners in [YA Global]," petitioners added, "any allocations of income to them were not distributive shares under section 704 but were, instead, made to them 'other than in [their] capacity] as . . . member[s] of [the] partnership.'" On the premise that "[a]ny allocations to the [Foreign] SPVs were attributable to withdrawn capital," petitioners concluded that those allocations could not have been made under section 704(b).

In a Response to petitioners' November 16 Report, respondent argued that we should not allow petitioners to raise the Foreign SPVs' status as partners in YA Global because petitioners had not pleaded the issue. Respondent claimed to be "unduly surprised and prejudiced." He continued:

> Whether the [Foreign] SPVs were partners of YA Global raises factual and legal questions quite unlike those that were presented at trial with respect to YA Global's lending, underwriting, and financing activities. Had respondent known that petitioners did not consider the SPVs to be partners of YA Global, respondent would have sought to discover additional information before trial and would have sought to present additional evidence or elicit additional testimony at trial. Respondent would face extreme prejudice if he were required to mount a challenge to petitioners' new argument and factual assertions at this stage, two years post-trial. The Court, therefore, in its

**[\*22]** sound discretion, should decline to consider petitioners' new argument.

On the merits of the issue, respondent argued, in essence, that petitioners should be bound by YA Global's tax reporting. As respondent observed: "YA Global treated the SPVs like partners, maintaining capital accounts on their behalf and allocating YA Global's income and loss to them." Respondent dismissed as "immaterial" YA Global's reporting of a liability to the SPVs on its 2009 financial statements. "[A] partnership," he observed, "can owe a liability to a partner."

In an Order issued January 12, 2023 (January 12 Order), we noted that petitioners had "offered no explanation of why they had failed to raise in either their opening or answering brief their argument that no ECTI of YA Global for 2009 would be properly allocable to the foreign SPVs." "Before deciding whether to consider petitioners' argument," we resolved to "give them the opportunity to explain why we should not treat them as having conceded the argument and why raising the argument for the first time more than two years after trial [would] not [be] untimely."

In a Supplemental Brief they filed in response to the January 12 Order, petitioners contended that the record was sufficient for us to resolve the legal question of the Foreign SPVs' status as partners of YA Global. On that premise, petitioners argued that respondent would "not be prejudiced by [our] consideration of th[eir] argument." "The evidence in the record," in their view, "demonstrates that the Foreign SPVs were not partners in YA Global."

Petitioners' Supplemental Brief also elaborated on their substantive argument on the Foreign SPVs' status and their entitlement to allocations of YA Global's ECTI. Petitioners claimed that the Foreign SPVs had no intent to join in any business conducted by YA Global and share in the profits or losses of that business. On that premise, petitioners reasoned, the Foreign SPVs were not partners in YA Global under the test enunciated in *Commissioner v. Culbertson*, 337 U.S. 733 (1949). As explained in more detail below, the *Culbertson* Court rejected this Court's view that "essential to membership in a family partnership for tax purposes [is] the contribution of either 'vital services' or 'original capital.'" *Id.* at 741. It noted that its prior opinion in *Commissioner v. Tower*, 327 U.S. 280 (1946), "provide[d] no support for such an approach." *Commissioner v. Culbertson*, 337 U.S. at 741. It added:

**[\*23]** The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard supposedly established by the *Tower* case, but whether, considering all the facts . . . the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.

*Id.* at 742. (Although *Culbertson*, like *Tower*, addressed a family partnership, courts have since used the *Culbertson* test to determine whether partnerships involving unrelated persons should be recognized for tax purposes. *E.g.*, *Bussing v. Commissioner*, 88 T.C. 449, 460 (1987).)

Petitioners acknowledge that section 704(e)(1), as in effect for 2009, required that the owner of a capital interest in a partnership be recognized as a partner if capital is a material factor in the production of a partnership's income. Petitioners argue, however, that "[f]ormer section 704(e) was not intended to create an additional or alternative test to *Culbertson*." They claim support for that argument from a report of the Staff of the Joint Committee on Taxation prepared in connection with the 2015 repeal of section 704(e). Staff of J. Comm. on Tax'n, 114th Cong., General Explanation of Tax Legislation Enacted in 2015, JCS-1-16 (2015 Bluebook), at 83–84 (J. Comm. Print 2016). The 2015 Bluebook explains that Congress repealed section 704(e)(1) "to eliminate any argument that the provision applies an alternative test as to whether the holder of a capital interest is a partner with respect to that interest, or whether the interest constitutes a capital interest in a partnership." 2015 Bluebook at 84.[14]

In a Response to petitioners' Supplemental Brief, respondent argued, among other things, that (1) the record is insufficient to support a conclusion that the Foreign SPVs were not partners in YA Global, and (2) the weight of the evidence that *is* in the record supports a contrary conclusion. Respondent observed that any shareholders who wanted to promptly terminate their indirect participation in YA Global could have elected to receive in-kind distributions. "By not taking that option," respondent continued, "the ultimate investors through the Foreign SPVs chose to remain in business with YA Onshore, YA Offshore, and the

---

[14] By "alternative test," the Joint Committee staff apparently meant an alternative to the *Culbertson* test. In its description of pre-2015 law, the staff cited *Culbertson* as having provided "the test of a partnership." 2015 Bluebook at 83.

[*24] other SPVs." Respondent infers that "[t]he Foreign SPVs wanted YA Global to hold, sell, exchange, transfer, or otherwise manage and deal with the securities YA Global held in 2009 and maximize the profits on those securities before the Foreign SPVs' interests were redeemed." Respondent dismisses as "immaterial" the Foreign SPVs' lack of participation in "new investments." He contends:

> The Foreign SPVs remained in partnership with YA Onshore, YA Offshore, and the other SPVs for the ongoing management of the currently held securities and profited or lost on those investments accordingly. They depended on YA Global's hired investment manager to oversee the securities and dispose of them in the partners' best interests. . . . As a consequence, the Foreign SPVs continued to bear the risk of loss and enjoy the fruits of YA Global's activities.

B.    *Analysis*

As we suggested in our January 12 Order, we do not view petitioners as seeking to raise a new, unpleaded issue "but instead raising for the first time after their submission of multiple briefs a new argument in regard to an issue that has been in the case from the outset." In both their initial and amended Petitions, petitioners alleged that "the Commissioner erred in determining that . . . the partnership is liable for withholding tax [for 2009] in the amount of $6,748,616." Thus, as we observed in the January 12 Order, "[t]he assignments of error in petitioners' petitions are sufficiently broad to encompass the question of whether any liability for 2009 withholding tax ultimately determined should include amounts attributable to the [F]oreign SPVs." We also noted that "Rule 151(e)(5) . . . requires a party's brief to contain a statement of the party's argument, setting forth and discussing 'the points of law involved and any disputed questions of fact.'" Citing *Gregory v. Commissioner*, T.C. Memo. 2018-192, at *10–11, and *Remuzzi v. Commissioner*, T.C. Memo. 1988-8, *aff'd on other grounds*, 867 F.2d 609 (4th Cir. 1989) (unpublished table decision), we warned that "[a]rguments not made on brief may be treated as having been conceded."

Petitioners have failed to offer us a valid reason not to treat them as having conceded that the Foreign SPVs were partners in YA Global during 2009 and, as such, were entitled to receive allocations of ECTI. Petitioners allege that the record is sufficient to allow us to resolve the

**[*25]** issue and that, consequently, respondent would not be prejudiced by our allowing petitioners to raise the issue. The reason we treat arguments not made on brief as conceded, however, is not to avoid prejudice to the opposing party. Instead, treating an argument not made on brief as conceded is a sanction for noncompliance with Rule 151(e).

Moreover, we do not agree that the record is sufficient for us to determine whether the Foreign SPVs were partners in YA Global. According to YA Global's 2009 financial statements, the SPVs held "pro rata participation interests" in securities. Petitioners point to no evidence in the record that details the terms of the participation interests or identifies how title to the securities covered by those interests was held. Did the participation interests give the Foreign SPVs undivided ownership interests in specified securities? Or were they instead simply contractual rights to receive proceeds upon the sale of those securities? The record does not say.

It does not follow, however, that respondent would be prejudiced were we to address on the merits the question of the Foreign SPVs' status. Because petitioners bear the burden of proof under Rule 142(a), they bear the consequences of the record's inadequacy. Therefore, whether we treat petitioners as having conceded that the Foreign SPVs were partners entitled to allocations of ECTI or instead address the issue on the merits, we would reach the same result: YA Global's liability for section 1446 withholding tax for 2009 should take into account the Foreign SPVs' shares of the partnership's ECTI for the year.

1. *The Importance of the Terms of the Participation Interests*

We agree with petitioners that, if the participation interests the Foreign SPVs held gave them undivided ownership interests in the subject securities, the Foreign SPVs would not have been partners in YA Global. But they may well have been more than "mere" co-owners. While the Foreign SPVs, if co-owners, would not have been partners *in* YA Global, they might have been (indeed, probably would have been) partners *with* YA Global.[15] Even if the participation interests gave the

---

[15] Although petitioners argue that "the SPVs were merely co-owners of illiquid assets," they do not identify the other co-owner(s). We take it as a given, however, that the Foreign SPVs were not co-owners with YA Onshore and YA Offshore. The parties do not dispute that YA Global was a partnership or that YA Onshore and YA Offshore were partners in that partnership. Therefore, YA Onshore and YA Offshore were, inter

**[*26]** Foreign SPVs title to portions of the securities, the Foreign SPVs' interests apparently went beyond co-ownership of some of the securities managed by the partnership. The Schedules K–1 issued to the Foreign SPVs reported allocations to them of each item of income, loss, and deduction shown on YA Global's Schedule K. While the Schedules K–1 are not dispositive, they are evidence of the economic arrangement between YA Global and the Foreign SPVs. Petitioners do not identify any evidence that calls into question the accuracy of the Schedules K-1 in reflecting that economic arrangement. We can think of no economic justification for allocating to the Foreign SPVs a share of each item of income, loss, and deduction (including, for example, legal and other professional fees) if the Foreign SPVs were merely co-owners, with YA Global, of specified securities. If they were, indeed, co-owners, they also shared economically in the results of activities that we have concluded constitute a trade or business. *See, e.g.*, *Cusick v. Commissioner*, T.C. Memo. 1998-286, 1998 WL 440881, at *4 ("[T]he distinction between mere coowners and coowners who are engaged in a partnership lies in the degree of business activity of the coowners or their agents.").

If the Foreign SPVs were partners with YA Global in a lower tier partnership engaged in a U.S. trade or business, the Foreign SPVs would have been allocated a share of the ECTI of that lower tier partnership. Section 1446 withholding tax would have been owed in respect to the Foreign SPVs' share of that ECTI. But that section 1446 withholding tax would have been a partnership item of the lower tier partnership. Our jurisdiction in the present cases allows us to determine only YA Global's partnership items. It does not extend to the determination of any section 1446 withholding tax liability, or any other partnership items, of any partnership that might have existed between YA Global and the Foreign SPVs. In short, if the record established that the participation interests distributed to the Foreign SPVs gave them undivided ownership interests in the subject securities, YA Global's section 1446 withholding tax liability would not include any amounts attributable to the Foreign SPVs. And we could not determine in these cases any section 1446 withholding tax owed by any lower tier partnership between YA Global and the Foreign SPVs.

But the record does *not* establish that the participation interests distributed to the Foreign SPVs gave them undivided ownership interests in the subject securities. We must therefore consider the

---

se, partners and not co-owners. If the Foreign SPVs were co-owners, they must have been co-owners with YA Global itself.

**[*27]** consequences that would ensue if the participation interests instead were contract rights that entitled the Foreign SPVs to share in the proceeds received by YA Global from the sale of securities that it owned outright. In that event, as explained below, the Foreign SPVs *would have* been partners in YA Global, and the partnership's section 1446 withholding tax liability for 2009 would have included tax on the Foreign SPVs' shares of the partnership's ECTI. If the participation interests were contract rights to shares of the proceeds from the sale of specified securities owned by YA Global, then the Foreign SPVs owned capital interests in YA Global and section 704(e)(1), as in effect for 2009, would have required the Foreign SPVs to be recognized as partners in YA Global. Moreover, even if petitioners were correct that section 704(e)(1) did not require recognition as a partner of a capital interest owner who would not have been treated as a partner under the *Culbertson* test, we would still conclude that petitioners have not met their burden of proof. The record does not allow us to conclude that the Foreign SPVs were not partners in YA Global under *Culbertson*.

2. *The Foreign SPVs as Partners Under Section 704(e)(1)*

If the participation interests distributed to the Foreign SPVs provided them with contractual rights to proceeds from the sale of securities owned entirely by YA Global, rather than direct ownership interests in those securities, then the Foreign SPVs owned capital interests in YA Global. Treasury Regulation § 1.704-1(e)(1)(v) provides: "For purposes of section 704(e), a capital interest in a partnership means an interest in the assets of the partnership, which is distributable to the owner of the capital interest upon his withdrawal from the partnership or upon liquidation of the partnership."

If the Foreign SPVs owned capital interests in YA Global, the plain terms of section 704(e)(1) would require that they be recognized as partners. Before its repeal in 2015, section 704(e)(1) provided: "A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person." Petitioners make no argument that capital was not a material factor in producing YA Global's income.

But petitioners would have us interpret section 704(e)(1) so that it did not require recognition of the owner of a capital interest as a partner in a partnership if the capital interest owner did not intend to

[*28] join in the conduct of the partnership's business. Petitioners' proposed interpretation would add a condition absent from the statutory test for the recognition of a capital interest owner as a partner. Under the plain terms of section 704(e)(1), the owner of a capital interest in a partnership in which capital is a material income-producing factor must be recognized as a partner regardless of the capital interest owner's subjective intent to participate in the partnership's business. Moreover, petitioners' proposed interpretation of section 704(e)(1) is not only contrary to the statute's plain text; its adoption could also frustrate Congress's purpose in enacting the rule.

Congress enacted the predecessor of section 704(e)(1) in 1951, in response to the Supreme Court's opinions in *Tower* and *Culbertson*. As noted, both cases addressed family partnerships, which the *Tower* Court described as an "acute problem." *Commissioner v. Tower*, 327 U.S. at 284. (In particular, the problem the Court saw was the use of family partnerships to try "to escape surtaxes by dividing one earned income into two or more." *Id.*)

In a typical family partnership arrangement, a family's primary income-earner would make gifts to other family members. The donees would then contribute the proceeds of the gift to a partnership with the donor. If the arrangement were respected, income that would otherwise have been taxed to the donor would instead be taxed (usually at lower rates) to the donees. The Court in *Tower* and *Culbertson* sought to apply to family partnerships fundamental concepts of the assignment of income—in particular, the principle that income from property should be taxed to its owner.

*Tower* involved a husband and wife who had been majority shareholders in a corporation. (The husband had owned 445 out of 500 shares, the wife only 5 shares.) The husband transferred 190 shares to his wife. The corporation then liquidated, and its assets were contributed to a new partnership. The question before the Court was whether the income attributable to the wife's interest in the partnership was taxable to her or to her husband. The Court wrote:

> We are of the opinion that the . . . facts were sufficient to support the Tax Court's finding that the wife was not a partner in the business. A partnership is generally said to be created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there

**[*29]** is community of interest in the profits and losses. When the existence of an alleged partnership arrangement is challenged by outsiders, the question arises whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both. . . . Here the Tax Court, acting pursuant to its authority in connection with the enforcement of federal laws, has found from testimony before it that [the husband] and his wife did not intend to carry on business as a partnership. This finding of fact, since supported by evidence, is final.

*Commissioner v. Tower*, 327 U.S. at 286–87 (footnotes omitted). The Court acknowledged the possibility that a husband and wife could form a valid tax partnership. If, for example, the wife "either invests capital originating with her or substantially contributes to the control and management of the business, or otherwise performs vital additional services, or does all of these things," the Court accepted, "she may by a partner." *Id.* at 290. The Court added that, when the wife

> does not share in the management and control of the business, contributes no vital additional service, and where the husband purports in some way to have given her a partnership interest, the Tax Court may properly take these circumstances into consideration in determining whether the partnership is real within the meaning of the federal revenue laws.

*Id.*

*Culbertson* involved a ranching business allegedly conducted by a partnership among a father and his four sons. The business had previously been operated by a partnership between the father and an unrelated individual. After buying out his former partner, the father sold interests in the cattle to his sons in exchange for notes that were ultimately either forgiven or repaid from profits of the business. The older son received a salary for serving as foreman on the ranch before entering the Army. The second son also served in the Army. The two younger sons were in school and worked on the ranch only in the summer.

This Court declined to recognize a tax partnership among the father and his sons. *Culbertson v. Commissioner*, 6 T.C.M. (CCH) 692

[*30] (1947), *rev'd*, 168 F.2d 979 (5th Cir. 1948), *rev'd and remanded*, 337 U.S. 733 (1949). We reasoned that the father was the source of all capital in the business and the sons had not contributed sufficient services to justify recognition as partners. (The oldest son, having been paid for his services, made no contribution at all.)

The Supreme Court, on hearing the case, judged that we had been too rigid in applying *Tower*. The contribution of either vital services or original capital, the Court explained, is not essential for one to be recognized as a partner. Instead, they are simply factors to consider. The Court then described the governing inquiry as follows:

> The question [of whether a family partnership is real for income tax purposes] is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard supposedly established by the *Tower* case, but whether, considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.

*Commissioner v. Culbertson*, 337 U.S. at 742. The Supreme Court thus remanded the case to this Court. It directed us to consider, as to each of the sons, whether "there [was] a bona fide intent that they be partners in the conduct of the cattle business, either because of services to be performed during th[e] years [in issue], or because of contributions of capital of which they were the true owners." *Id.* at 748.

In response to *Tower* and *Culbertson*, Congress determined that basic assignment of income principles should be applied in the context of partnerships in the same way that they apply in other contexts. *See generally* H.R. Rep. No. 82-586, at 32–34 (1951), *reprinted in* 1951 U.S.C.C.A.N. 1781, 1815–13; S. Rep. No. 82-781, at 38–41 (1951), *reprinted in* 1951 U.S.C.C.A.N 1968, 2008–10. In other contexts, bona fide gifts of property, such as real estate or corporate stock, shift to the donee the incidence of taxation on the income produced by the property. The same should be true, Congress determined, of a bona gift of a partnership interest or capital used to acquire a partnership interest.

**[\*31]** The committee reports accompanying the Revenue Act of 1951 do not explicitly state an intent to overrule *Tower* or *Culbertson*. Instead, they describe Congress as addressing "confusion" that arose from those cases, "[w]hether or not the [Court's] opinion[s] . . . afford any justification for the confusion." H.R. Rep. No. 82-586, at 33, *reprinted in* 1951 U.S.C.C.A.N. at 1814; S. Rep. No. 82-781, at 39, *reprinted in* 1951 U.S.C.C.A.N. at 2009.

Notwithstanding Congress's deference to the Supreme Court, in enacting the predecessor of section 704(e)(1) Congress called for a different focus in the analysis of family limited partnerships. While *Tower* and *Culbertson* focused on the parties' subjective intent, Congress focused the inquiry on the reality of capital ownership. *Tower* and *Culbertson* left open the possibility that a taxpayer like Mrs. Tower, who contributes no substantial services to a family partnership and whose only contribution of capital to the partnership was funded by an intrafamily gift, might not be recognized as a partner. Congress intended that, as long as the gift was real, the donee partner *should* be recognized as a partner. If section 704(e)(1) were interpreted to allow withholding recognition of the donee as a partner unless the donee and others involved really intended to carry on business as a partnership, the statute would not have achieved Congress's purpose of "harmoniz[ing] the rules governing interests in the so-called family partnership with those generally applicable to other forms of property or business." H.R. Rep. No. 82-586, at 32, *reprinted in* 1951 U.S.C.C.A.N. at 1813; S. Rep. No. 82-781, at 38, *reprinted in* 1951 U.S.C.C.A.N. at 2008. Dividends, for example, are taxed to the owner of the stock on which the dividends are paid. If partnership income may be taxed to someone other than the owner of the interest in the capital that produced the income, depending on the parties' subjective intentions, basic assignment of income principles would not apply uniformly to partnerships and "other forms of property or business."

The 2015 Bluebook does not establish petitioners' proposition that, when Congress enacted section 704(e)(1)'s predecessor in 1951, it did not intend to provide an alternative or additional test to that articulated in *Culbertson*. The Joint Committee staff can speak with some authority in 2016 on the reasons Congress repealed section

**[\*32]** 704(e)(1) the previous year.[16]  It has little or no authority to explain why Congress first enacted that statutory rule 65 years earlier.[17]

Moreover, the Joint Committee staff recognized that, before 2016,[18] an argument *could have* been made that section 704(e)(1) "provides an alternative test as to whether the holder of a capital interest is a partner."  2015 Bluebook at 84.  Had that not been a potentially valid argument, Congress would not have needed to take action to "eliminate" the argument.  *Id.*

The 2015 Bluebook indicates that Congress repealed section 704(e)(1) in response to *TIFD III-E Inc. v. United States*, 660 F. Supp. 2d 367, 394 (D. Conn. 2009), *rev'd*, 666 F.3d 836 (2d Cir. 2012), in which the District Court for the District of Connecticut accepted the possibility that an entity might not "qualify as a partner under *Culbertson* and still . . . qualify as a partner in a partnership under section 704(e)(1)."  The case involved a partnership known as Castle Harbour, formed by subsidiaries of General Electric Capital Corp. and two Dutch banks.  In its initial opinion in the case, the district court concluded that the formation of Castle Harbour was not a sham transaction, the Dutch banks were partners in Castle Harbour, and the allocations of partnership income to them satisfied the substantial economic effect

---

[16] In *Redlark v. Commissioner*, 106 T.C. 31, 45 (1996), *rev'd*, 141 F.3d 936 (9th Cir. 1998), we wrote that, although a "Joint Committee Staff Explanation . . . is not part of the legislative history," it is nonetheless "entitled to respect."  We added, however, that, "[w]here there is no corroboration in the actual legislative history, we [would] not hesitate to disregard [a] General Explanation as far as congressional intent is concerned."  *Id.*  The Court of Appeals for the Ninth Circuit, in reversing our decision, agreed that "post-enactment explanations," such as those often provided by the Staff of the Joint Committee on Taxation, "cannot properly be described as 'legislative history'" but accepted that "they are at least instructive as to the reasonableness of an agency's interpretation of a facially ambiguous statute."  *Redlark v. Commissioner*, 141 F.3d at 941.  The "Bluebook" considered in *Redlark*, however, was prepared shortly after and in connection with the legislation that enacted the statute in issue.

[17] In *Mars, Inc. v. Commissioner*, 88 T.C. 428, 435 (1987) (quoting *United States v. Southwestern Cable Co.*, 392 U.S. 157, 170 (1968)), we wrote: "[I]t is well settled that 'the views of one Congress as to the construction of a statute adopted many years before by another Congress have "very little, if any, significance."'"  In *Mars*, we addressed official legislative history: a report of the Senate Finance Committee.  If postenactment legislative history should be given little, if any, weight, even less weight should be given to unofficial sources, such as Joint Committee staff explanations, purporting to interpret legislation enacted "many years before."

[18] The Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 1102(b)(1) and (c), 129 Stat. 584, 639, repealed section 704(e)(1), effective for partnership taxable years beginning after December 31, 2015.

**[\*33]** requirement of section 704(b). *TIFD III-E Inc. v. United States*, 342 F. Supp. 2d 94, 109 (D. Conn. 2004), *rev'd*, 459 F.3d 220 (2d Cir. 2006). The U.S. Court of Appeals for the Second Circuit reversed on the ground that the Dutch banks "were not bona fide equity partners in Castle Harbour." *TIFD III-E, Inc.*, 459 F.3d at 240. The appellate court nonetheless remanded the case to allow the district court to determine, among other things, whether "the partnership was a family partnership under the provisions of I.R.C. § 704(e)."[19] *Id.* at 241 n.19. On remand, the district court accepted that the Second Circuit's opinion established that "the Dutch Banks were not partners in Castle Harbour under *Culbertson*." 660 F. Supp. 2d at 395. Nonetheless, the court concluded that section 704(e)(1) required the recognition of the Dutch banks as partners. The Second Circuit then reversed the district court's judgment a second time. *TIFD III-E Inc.*, 666 F.3d 836. The appellate court did not reject the notion that section 704(e)(1) requires that the owner of a capital interest be recognized as a partner regardless of that person's subjective intent to participate in the partnership's business.[20] Instead, the court concluded that section 704(e)(1) did not apply. Because the Dutch banks' interests in Castle Harbour were overwhelmingly in the nature of debt, if not outright debt, those interests, in the Second Circuit's view, were not capital interests within the meaning of section 704(e)(1).

We agree with the District Court for the District of Connecticut that section 704(e)(1), interpreted in accordance with its plain terms and consistent with the intent expressed by the Congress that enacted the provision's predecessor, may require the recognition as a partner of one who holds a capital interest in a partnership but would not be recognized as a partner under *Culbertson*'s intent test. We doubt, however, that that situation would often arise. (Given the ultimate disposition of the Castle Harbour litigation, it did not arise in *that* case.) It would be unusual for a person to put capital at risk in a business in which the person had no intention of participating. Putting capital at risk is itself a form of participation. The cases before us, however, involve unusual circumstances. While the Foreign SPVs may, depending on the terms of

---

[19] Although section 704(e) was captioned "Family partnerships," that caption did not limit the provision's scope. *See, e.g.*, *Carriage Square, Inc. v. Commissioner*, 69 T.C. 119, 126 n.4 (1977); *Evans v. Commissioner*, 54 T.C. 40, 51 (1970), *aff'd*, 447 F.2d 547 (7th Cir. 1971).

[20] In fact, the Second Circuit was willing to assume "that there may be circumstances in which the application of *Culbertson* and § 704(e)(1) yields different results as to whether the purported holder of a partnership interest qualifies as a partner." *TIFD III-E, Inc.*, 666 F.3d at 847 n.8.

[*34] their participation interests, have owned capital interests in YA Global, the Foreign SPVs' owners had initiated a process that would eventually lead to the liquidation of their indirect interests in YA Global. It is that scenario that raises the prospect that section 704(e)(1) and *Culbertson* might lead to different results.

For the reasons explained above, we conclude that, if the participation interests held by the Foreign SPVs provided them with contractual rights to proceeds from the sale of securities owned by YA Global, so that the Foreign SPVs held capital interests in the partnership, section 704(e)(1), as in effect for 2009, would have required recognition of the Foreign SPVs as partners regardless of the extent to which they intended to join YA Onshore and YA Offshore in the conduct of YA Global's business.

### 3. *The Foreign SPVs as Partners Under* Culbertson

Moreover, even if we were to accept petitioners' claim that the Foreign SPVs cannot be recognized as partners in YA Global unless they satisfied the *Culbertson* test, we would conclude that petitioners have not established that *Culbertson* precludes recognition of the Foreign SPVs as partners in YA Global. The record establishes that the Foreign SPVs were created for the benefit of investors in YA Offshore who sought redemption of their indirect interests in YA Global but declined the option of having their interests redeemed immediately by in-kind distributions of securities. Instead, each investor chose to receive an interest in a Foreign SPV so that the securities the investor would otherwise have received in redemption would continue to be managed by Yorkville Advisors on behalf of YA Global. As YA Global sold securities in the ordinary course of what we have concluded to be a trade or business, each Foreign SPV would receive a share of the proceeds from the sale of those securities in which it held participation interests. The Foreign SPV, we assume, would then distribute proceeds to the ultimate investors. Once all the securities in which a Foreign SPV held participation interests had been sold, the indirect interests in YA Global of those investors who declined immediate in-kind distributions would be fully liquidated. Petitioners would apparently impute to the Foreign SPVs the intentions of their owners. Because the owners had initiated a process that would eventually result in the complete liquidation of the owners' indirect interests in YA Global, petitioners argue that the Foreign SPVs did not intend to join YA Onshore and YA Offshore in the conduct of YA Global's business.

**[\*35]** If the owners of the Foreign SPVs had wanted to cease their indirect participation in YA Global's business, they would have chosen to be redeemed by means of in-kind distributions. As respondent observes, that the Foreign SPVs' owners rejected that choice indicates that they saw a benefit in allowing the continued joint management of YA Global's securities. They specifically chose to continue their participation in YA Global's business until all the securities in which they held indirect interests had been liquidated in the course of that business. Therefore, the evidence in the record does not establish that the subjective intentions of the Foreign SPVs would preclude their recognition as partners of YA Global under *Culbertson*.

Petitioners' position, as we understand it, ultimately rests on a false premise. A partner does not cease being a partner simply by announcing an intention to withdraw from the partnership. Even if the partner goes further and surrenders his partnership interest in exchange for a right to share in the proceeds from sales of specified assets, the partner *still* remains a partner until he receives the final payment. That is the mandate of section 736, which provides rules governing the treatment of withdrawing partners. Under that section, a withdrawing partner remains a partner until his interest in the partnership is completely liquidated.

*Brennan v. Commissioner*, T.C. Memo. 2012-209, 2012 WL 3000336, *aff'd*, 621 F. App'x 408 (9th Cir. 2015), illustrates the effect of section 736 in a situation closely analogous to that of the owners of the Foreign SPVs. The taxpayer in *Brennan* had been a partner in a partnership that managed asset portfolios for wealthy individuals and institutional investors. As part of a restructuring of the partnership in 2002, the taxpayer surrendered his membership interest. Thereafter, his only interest in the partnership was a right to share in the proceeds of the partnership's sale of specified assets. The partnership reported capital gains from that sale in 2003 and 2004. The taxpayer argued that he should not have been allocated any shares of those gains because his status as a partner terminated in 2002. We disagreed. Relying on section 736, we concluded that the taxpayer remained a partner for tax purposes in 2003 and 2004 and had to take into account his distributive shares of the partnership's capital gains in those years, along with various other items. If the owners of the Foreign SPVs had held their interests in YA Global directly, rather than through YA Offshore, they would have been in the same situation as the taxpayer in *Brennan*. The present facts are distinguishable from those of *Brennan* in that the Foreign SPVs apparently had no interest in YA Global before they

**[\*36]** received their participation interests. Nonetheless, *Brennan* shows that the fundamental assumption that seems to underlie petitioners' position is contrary to the treatment of withdrawing partners under section 736.

4. *Allocations to Foreign SPVs as Distributive Shares*

Petitioners thus have not met their burden of establishing that the Foreign SPVs were not partners in YA Global. Petitioners argue, however, that, even if the Foreign SPVs were partners, the allocations they received were not distributive shares of partnership income. Instead, petitioners claim, the Foreign SPVs received those allocations in a capacity other than that of partners. They rely on section 707(a), which provides rules that govern transactions between a partnership and a partner in which the partner acts in a nonpartner capacity. For example, if a partner leases property to the partnership, the compensation for the use of the property is deductible by the partnership and rental income to the partner rather than a distributive share of the partnership's income. If the partnership makes a purported distributive share allocation to the partner as compensation for its use of the property, the allocation will not be respected. Treas. Reg. § 1.704-1(b)(1)(v). Petitioners fail to identify any transactions between YA Global and the Foreign SPVs in which the latter acted in capacities other than as partners. Petitioners appear to claim that *none* of the allocations made to the Foreign SPVs can be distributive shares of YA Global's ECTI. They base that claim not on the Foreign SPVs' role in any particular transaction but on the Foreign SPVs' status in relation to YA Global. In short, their section 707(a) argument repeats, in a different guise, their argument that the Foreign SPVs should not be recognized as partners in YA Global. We have already concluded that the record does not support that argument. Section 707(a) does not provide grounds to treat allocations to the Foreign SPVs as other than ECTI if those entities are recognized as partners of YA Global.[21]

Finally, petitioners rely on YA Global's financial statements for the proposition that "[a]ny allocations to the SPVs were attributable to withdrawn capital . . . and therefore could not be allocations [of distributive shares of partnership income] under section 704(b)." Our

---

[21] A partnership's income cannot be ECTI as to some partners but not others. For the purpose of determining a partnership's section 1446 withholding tax liability, "[t]he calculation of partnership ECTI allocable to foreign partners . . . and the partnership's withholding tax obligation are partnership-level computations." Treas. Reg. § 1.1446-2(a).

**[\*37]** response to that argument is simple:  Financial statements do not determine tax consequences.[22]

### 5.    *Conclusion*

We thus conclude that YA Global's section 1446 withholding tax liability for 2009 includes the product of (1) the items of partnership income, gain, loss, and deduction allocable to the Foreign SPVs,[23] and (2) the highest marginal tax rate specified in section 11(b)(1).  Each Foreign SPV's shares of partnership income, gain, loss, and deduction include (1) those items reported on the Schedule K–1 issued to it other than the writeoff of interest receivable deemed uncollectible included in the other deductions reported on line 13d,[24] and (2) the Foreign SPV's share of YA Global's mark-to-market gain for 2009 under section 475(a)(2).

### III.    *Value of Accrued Interest on Debentures as of December 31, 2009*

An Order issued August 10, 2022 (August 10 Order), listed the initial questions to be discussed at the August 31, 2022, remote hearing. Among other things, we asked whether "respondent agree[d] with petitioners that the accrual of interest on a debenture held by [YA Global] created an asset separate from the underlying debenture."  We also asked about the interrelationship of sections 165, 166, and 475.  In particular, we asked whether, if YA Global's convertible debentures were subject to the mark-to-market rule of section 475(a)(2), as respondent alleged, accrued interest on the debentures "would be taken into account in determining the [debenture's] basis and fair market value for the purpose of determining the gain or loss that the partnership would recognize under section 475(a)(2)."  We noted that

---

[22] Financial statements can, of course, be evidence of facts relevant to the determination of tax consequences.  That YA Global's financial statements report the distribution of participation interests to the Foreign SPVs as withdrawals of capital may indicate that the participation interests provided the Foreign SPVs with undivided ownership interests in the subject securities.  The Schedules K–1 issued to the Foreign SPVs, however, point in the opposite direction, reporting substantial capital accounts.

[23] In our prior opinion, we concluded that petitioners had not established that any portion of YA Global's taxable income was not effectively connected with its U.S. trade or business.  *YA Glob. Invs., LP*, 161 T.C., slip op. at 62.

[24] As explained *infra* Part III, to the extent that doubts about collectibility reduce the value of the accrued interest on the debentures YA Global held on December 31, 2009, they should be taken into account in valuing the debentures for the purpose of determining YA Global's mark-to-market gain under section 475(a)(2).

**[\*38]** respondent seemed to have "accepted the values at which the partnership stated its debentures," by using those values in computing his mark-to-market adjustment, "but disregarded the partnership's write-off of accrued interest." We asked whether respondent could explain what we suggested may have been "inconsistent reliance on the partnership's financial reporting." We also asked whether petitioners would "hold to their contention that accrued interest is an asset separate from the underlying debenture should we decide that the partnership's debentures are securities subject to the mark-to-market rule of section 475(a)(2)."

In a report submitted after the hearing, respondent advised us that he "does not agree with petitioners that the accrual of interest on a debenture held by the partnership created an asset separate from the underlying debenture for purposes of section 475." Respondent simply chose not to contest the partnership's treatment of accrued interest as a separate asset. Instead, he "evaluated the accrued, but unpaid, interest as a separate asset for purposes of disallowing the deduction claimed . . . and not as part of the debentures for purposes of determining the adjustment under section 475."

Respondent rejected the notion that the write-off of allegedly uncollectable accrued interest would be "subsumed within the mark-to-market accounting" for the debentures. He argued for an approach reflected in regulations proposed in 1995, but not yet adopted, under which section 165 or 166, as applicable, would be applied before section 475(a)(2)'s mark-to-market rule. Prop. Treas. Reg. § 1.475(a)-1(f), 60 Fed. Reg. 397, 403 (Jan. 4, 1995). Under that approach, the basis of a wholly worthless debt would be reduced to zero under the applicable deduction provision and no gain or loss would be recognized under section 475(a)(2).

Respondent denied that he had been inconsistent in his reliance on YA Global's financial reporting. According to his posthearing Report:

> [R]espondent accepted, in the interest of sound tax administration, values from the partnership's financial reports when the information provided to respondent established that such values were sufficiently consistent with tax principles but did not accept amounts from the partnership's financial reports when neither the financial reports nor any other information provided to respondent substantiated that the amounts in the partnership's

**[\*39]** financial reports were sufficiently consistent with tax principles.

Respondent claims that "the partnership's own description of its accounting for its interest income is fundamentally inconsistent with any assertion that its interest income is reported in its financial reports at fair value." While YA Global stated its debentures at fair value, it stated accrued interest at either its full, nominal amount or zero. "Because the partnership's financial reports use different methods for treatment and valuation of the debentures and the amount of the interest accruals," respondent argues, he "was not inconsistent in accepting the valuation of the debentures while rejecting the amounts reported for the interest accruals."

In their posthearing Report, petitioners agreed with the proposition that "*if* the Fund were a dealer in securities within the meaning of section 475 and *if* the debentures it purchased were not held for investment—then the plain language of section 475 and the regulations thereunder would require that the loss in value of the securities be treated as a reduction in the Fund's income." Regarding respondent's reliance on Proposed Treasury Regulation § 1.475(a)-1(f), petitioners argue that "[p]roposed regulations . . . have no legal effect unless and until they are adopted."

Petitioners acknowledge that "[t]here were many times when the Fund wrote off interest with respect to underlying debentures that were reported at values below par." Petitioners apparently mean that the debentures were reported at values that, while below par, were greater than zero. For example, YA Global wrote off all the interest that had accrued on the debentures and promissory notes issued by Access Beverage, Cobalis, Isonics, MM2, Poseidis, Speech Switch, Titan, and US Helicopter. Even after the writedowns agreed to at the November 24, 2009, meeting of Yorkville Advisors' Investment Committee, however, the partnership continued to state those notes and debentures at a substantial portion (50% to 80%) of their face value. Nonetheless, petitioners characterize as "untenable" "[r]espondent's willingness to accept the determinations made by the Fund's management and its auditors with respect to the valuation of investments generally—but not with respect to the valuation of interest receivable."

Petitioners argue that "accrued interest receivable [can be viewed] as an asset separate from its underlying debenture when doing so is necessary to clearly reflect a taxpayer's income." Petitioners reason

**[\*40]** that, if YA Global's debentures were not subject to section 475(a), treating the accrued interest and the underlying principal as separate assets would have been necessary because the former would be an ordinary income asset while the latter would be a capital asset. Petitioners allow, however, that, "[i]f the debentures were subject to the mark-to-market rules of section 475, it would not matter whether the accrued interest were viewed as an asset separate from the underlying debentures because any loss from the worthlessness of the interest or the underlying principal invested would be ordinary in character."

As noted *supra* Part I, our prior opinion establishes that, under section 475(a)(2), YA Global is required to recognize gain or loss as if each security it held on December 31, 2009, had been "sold for its fair market value" on that date. The parties agree that, given that conclusion, no grounds exist to treat interest accrued on a debenture and the underlying debenture itself as separate assets. Respondent argues that accrued interest and the underlying debenture can never be treated as separate assets. Petitioners argue that accrued interest can be treated as a separate asset if the underlying debenture is a capital asset. Under section 475(d)(3), however, any gain or loss recognized by YA Global under section 475(a)(2) is ordinary income or loss. Petitioners accept that, under those circumstances, accrued interest need not be treated as an asset separate from the debenture on which it accrued. Each debenture and the interest accrued on the debenture can appropriately be treated as a unitary asset for the purpose of determining YA Global's mark-to-market gain or loss under section 475(a)(2).

Under the circumstances, we also need not decide whether section 165 or 166 must be applied before section 475(a)(2). Respondent argues that the basis of a worthless security should first be reduced to zero under section 165 or 166, as applicable, before applying section 475(a)(2). Petitioners disagree. But respondent also argues that petitioners have not established YA Global's entitlement to a deduction under section 165 or 166.[25]

---

[25] As noted in the text, petitioners take the position that, if YA Global's debentures are subject to section 475(a)(2), neither section 165 nor section 166 would be applied before applying section 475(a)(2). Instead, petitioners accept that any decline in value of accrued interest because of doubts about collectibility would be taken into account in computing the partnership's mark-to-market gain or loss. Because we *have* concluded that YA Global's debentures are securities subject to

**[\*41]** We thus face the factual question of the value of the debentures YA Global held on December 31, 2009. In the December 1 Order, we identified that question as one of the issues in regard to YA Global's 2009 taxable year not resolved by our initial opinion. That Order invited the parties to submit supplemental briefs on that and the other remaining issues. Respondent, in his Supplemental Brief, pointed to various discrepancies and incongruities in the record, contending that it "does not include sufficient information to estimate the value of the accrued interest YA Global claimed as a writeoff or to assess whether, and to what extent, YA Global's mark-to-market gains for 2009 should be adjusted to account for any loss in value of its accrued interest."

By contrast, petitioners' Supplemental Brief directs us to four pages of the Report they submitted after the August 31, 2022, remote hearing. In that Report, petitioners maintained their positions (rejected in our prior opinion) that YA Global was not engaged in a U.S. trade or business, that it was not a "dealer in securities," within the meaning of section 475(c)(1), and that, even if it were, its securities would be exempted from section 475(a)(2)'s mark-to-market rule by the exception provided in section 475(b)(1)(A) for securities held for investment. As noted above, petitioners allowed that, *if* the partnership were a dealer and its securities subject to section 475(a)(2), doubts about the collectibility of accrued interest on a debenture would be taken into account in determining the partnership's mark-to-market gain or loss. And they agreed that, in that event, there would be no reason to treat as separate assets accrued interest on a debenture and the debenture itself. Given the procedural status of the cases, however, petitioners did not specifically address the question of the value that should be ascribed to the debentures if principal and accrued interest on each debenture were treated as elements of a unitary asset.

Our December 1 Order gave each party the opportunity to submit a reply to the other's Supplemental Brief. Neither party did so. Petitioners have thus left unchallenged respondent's claim that the record is insufficient to determine the extent to which the mark-to-market gain that respondent determined for YA Global's 2009 taxable year should be adjusted to reflect doubts about the collectibility of accrued interest on some of the debentures the partnership held on December 31, 2009.

---

section 475(a)(2), we treat petitioners as having conceded respondent's denial of the partnership's $46,506,023 deduction for allegedly uncollectible accrued interest.

**[\*42]** Both parties' positions have logical flaws grounded in YA Global's separate accounting for accrued interest on debentures and the debentures themselves. Respondent would treat all accrued interest as worth its full nominal amount, even if the underlying debenture were determined to be worth less than face value. By contrast, petitioners would have us accept that a debenture's principal could be worth a substantial portion of its face amount (e.g., 50% to 80%) while accrued interest on the debenture was worthless.[26]

Even though respondent's position, like petitioners', is logically flawed, we will nonetheless uphold the FPAA's determination that YA Global had mark-to-market gain under section 475(a)(2) of $103,852,672. Petitioners have made no argument grounded in the record about the extent of any adjustment to the mark-to-market gain determined in the FPAA necessary to reflect doubts about the collectibility of accrued interest on YA Global's convertible debentures and promissory notes.

IV.    *Requirement to Accrue Interest*

In an amended Petition filed in June 2020, petitioners made an affirmative claim that YA Global's 2009 income "must be reduced by $17,137,938," which, they claim, "represents interest income that the Partnership erroneously accrued in 2009 despite the fact that the collection of such interest income was doubtful, and it was reasonably certain that such interest income would never be paid."

Treasury Regulation § 1.451-1(a) provides: "Under an accrual method of accounting, income is includible in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy" (all events test). As the Supreme Court explained in *Spring City Foundry Co. v. Commissioner*, 292 U.S. 182, 184 (1934), for taxpayers "[k]eeping accounts and making returns on the accrual basis . . . it is the right to receive and not the actual receipt that determines the inclusion of the amount in gross income."

---

[26] Under its established accounting policies, YA Global writes off accrued interest "when management determines that payment by the debtor is unlikely." Even if the payment of accrued interest is less likely than not, it would not follow that the accrued interest adds nothing to the value of the underlying promissory note or debenture.

[*43] Under an exception to the all events test, a taxpayer need not accrue income whose receipt is sufficiently doubtful. The courts have articulated the governing standard in various ways. According to the Court of Appeals for the Second Circuit, income need not be accrued if "it is of doubtful collectability or it is reasonably certain it will not be collected." *Corn Exch. Bank v. United States*, 37 F.2d 34, 34 (2d Cir. 1930). In the same opinion, however, the court wrote that income should be accrued only if it is "likely to be paid or can be collected." *Id.*

In *Georgia School-Book Depository, Inc. v. Commissioner*, 1 T.C. 463, 469 (1943), this Court identified two circumstances in which accrual under the all events test would not be required. "To allow the exception," we wrote, "there must be a definite showing that an unresolved and allegedly intervening legal right makes receipt contingent or that the insolvency of his debtor makes it improbable." On the facts before us, we concluded that "there was no reasonable expectation that [the amounts in issue] would not ultimately be paid." *Id.* at 471. We applied the "no reasonable expectation" standard again in *Chicago & North Western Railway Co. v. Commissioner*, 29 T.C. 989, 996 (1958), concluding that the taxpayer before us was not required to accrue interest on debt owed to it by a subsidiary we described as "hopelessly insolvent."

The reasonable expectancy of payment exception to the all events test must be "strictly construed." *Eur. Am. Bank & Tr. Co. v. United States*, 20 Cl. Ct. 594, 605 (1990), *aff'd*, 940 F.2d 677 (Fed. Cir. 1991) (unpublished table decision). Like any exception, it "must not be allowed to swallow up the [general] rule." *Ga. School-Book Depository, Inc.*, 1 T.C. at 469. Applying the exception too broadly could allow a taxpayer "at his own will [to] shift the receipt of income from one year to another as should suit his fancy." *Id.*

To our knowledge, the characterization of the caselaw offered by the U.S. Court of Appeals for the Sixth Circuit in 1968 remains accurate: "In all of the cases . . . which have held an item non-accruable because of doubtful collectibility, substantial evidence had been presented as to the financial instability or even the insolvency of the debtor." *Jones Lumber Co. v. Commissioner*, 404 F.2d 764, 766 (6th Cir. 1968), *aff'g* T.C. Memo. 1967-81. Financial difficulties of a debtor that merely delay payment are not sufficient to avoid accrual. *See Hoffman v. Commissioner*, T.C. Memo. 1989-154; *Koehring Co. v. United States*, 190 Ct. Cl. 898, 910 (1970).

**[\*44]** YA Global's reporting of accrued interest demonstrates that it had a reasonable expectation of receiving the interest accrued when it recorded that interest. Under its established accounting policies, YA Global stopped accruing interest when its general partner determined that "there [was] reasonable doubt as to collectibility." When "management determine[d] that payment by the debtor [was] unlikely," the partnership wrote off accrued interest. In the August 10 Order, we asked: "Given the description of YA Global's accounting policies included in its financial statements, does [the accrual of interest] not indicate that the General Partner determined that there was no 'reasonable doubt as to collectibility' when the interest accrued and that any doubts arose only thereafter?"

At the August 31, 2022, remote hearing, petitioners' counsel advised us: "[T]he way the accruals worked is that the fund administrator just churned out this report every month. So it wasn't like they were making decisions on a monthly basis, accrue or don't accrue." She added: "It was just was [sic] completely immaterial until their financial reports. They had to do financial statements, and that's when they had to decide."

In their posthearing Report, petitioners wrote:

[T]he Fund's managers were not necessarily aware of events demonstrating a portfolio company's financial distress the moment those events occurred, and the financial statements do not suggest they would (or could) be. It would not be reasonable for the Fund's managers to review the likelihood of collectability for every debenture in the Fund's portfolio every month. Thus, the fact that management did not make the determination that interest should be written off (or not accrued) with regard to a particular debenture in a particular month did not reflect any determination that there was no reasonable doubt as to its collectability.

Exhibit 1290-P refutes petitioners' claims. It shows that YA Global *did* decide on a monthly basis whether to accrue interest on its debentures or promissory notes.[27]

---

[27] Respondent contends that Exhibit 1290-P is "unreliable and should not be given any credence or weight." Among other discrepancies, he observes that the amount shown on Exhibit 1290-P as interest written off is $99 less than the

[*45] Given the clear implications of YA Global's accounting policies, petitioners can prevail on their affirmative claim only by presenting evidence unavailable to YA Global's general partner during 2009 as the partnership accrued interest that establishes that the partnership should have had no reasonable expectation, when the interest accrued, of ultimately receiving it. In the report they submitted after the August 31, 2022, remote hearing, petitioners claim to "have presented objective evidence of identifiable events demonstrating the worthlessness of the interest receivables." They refer us to proposed finding 232 in their Opening Brief. That proposed finding lists four "identifiable events" petitioners claim to be indicative of a portfolio company's financial distress:

> (1) the financial statement auditor had expressed substantial doubt as to whether the particular portfolio company could continue as a going concern, (2) the portfolio company was in bankruptcy or similar proceedings, (3) the portfolio company was in default on its current obligations, (4) the portfolio company suffered substantive negative cash flows in its operations.[28]

Petitioners' proposed finding 232 includes a table that lists 19 of the issuers of debentures or promissory notes on which YA Global both accrued and wrote off interest for 2009: Cobalis, Compass, Earth Biofuels, Falcon, Futuremedia, Handheld, Ignis Petroleum, Innova Holdings, Inc., Isonics, iVoice, MM2, Pacific Gold, Poseidis, Tech Laboratories, Inc., Teleplus, Titan, TXP Corp., US Helicopter, and Wherify.[29] The table cites exhibits in the record that purportedly show

---

$46,506,023 that YA Global reported in its financial statements and on its tax return. The $99 difference may indicate a transposition error. Regardless, for the reasons explained in the text below, even if we were to accept the accuracy of Exhibit 1290-P, we would conclude that petitioners have not met their burden of establishing that YA Global overstated its 2009 interest income by $17,137,938.

[28] We are unsure what it means for a company to have "substantive" negative cashflow from operations. Perhaps petitioners meant to refer to a company's operating cashflow being *substantially* negative.

[29] The table also includes McKenzie Bay International, Ltd., Savi Media Group, Inc., and the Certo Group Corp. Of the 34 portfolio companies that issued debentures or promissory notes on which YA Global accrued and wrote off interest for 2009, petitioners make no mention in their briefs of 9 of them: Access Beverage, Corporate Strat., EYI Ind., Macmin Silver Ltd., Natural Nutrition, Inc., PNG Ventures, Inc., Renewable Fuels, Inc., Speech Switch, Inc., and United Fiber Systems. Another six issuers, BlueCreek Energy, Inc., CSI Business, KD Resources, Newgen Tech., NS8 Corp., and Terminal 1 receive only passing mention in petitioners' briefs. Petitioners

**[*46]** that each portfolio company had suffered from one or more of petitioners' four "identifiable events."

In their posthearing Report, petitioners argue:

> It is clear from these identifiable events that these portfolio companies were not in a financial position to make any interest payments that became due in 2009. These portfolio companies' history of nonpayment of interest also justified not accruing additional interest income in 2009. By the end of 2008, the interest in arrears under each debenture was already substantial . . . and the history of nonpayment continued through 2009. . . . When the substantial prior nonpayment of interest is viewed together with the evidence of financial distress experienced by these portfolio companies, there can be little doubt, much less reasonable doubt, that the interest payables were not collectible when each became due throughout 2009.

Most of the exhibits petitioners cite in their proposed finding 232 are filings made by the portfolio company under the federal securities laws. And most of those filings cover periods ended on or before September 30, 2008.[30] We assume that YA Global's general partner had access to the information reported in those filings when it chose to continue into 2009 the accrual of interest on debentures or promissory notes issued by those portfolio companies. It follows that the information reported in those filings did not prevent YA Global from

---

do not direct us to any evidence in the record as to the financial condition of any of those six portfolio companies.

[30] Petitioners refer us to a Form 10–Q filed by Earth Biofuels for the quarter ended September 30, 2008, a Form 10–QSB filed by Falcon for the quarter ended September 30, 2006, a Form 20–F filed by Futuremedia for the year ended June 30, 2007, a Form 10–Q filed by ZVUE Corp. (successor to Handheld) for the quarter ended September 30, 2008, a Form 10–KSB filed by Ignis Petroleum for the year ended January 30, 2008, a Form 10–QSB filed by Innova Robotics & Automation, Inc., for the quarter ended September 30, 2007, a Form 10–Q filed by Pacific Gold for the quarter ended September 30, 2008, a Form 10–QSB/A filed by Poseidis for the quarter ended May 31, 2006, a Form 10–QSB filed by Techlabs, Inc. for the quarter ended March 31, 2007, a Form 10–Q filed by Teleplus for the quarter ended September 30, 2008, a Form 10–KSB/A filed by TXP Corp. for the year ended December 31, 2007, a Form 10–Q filed by US Helicopter for the quarter ended September 30, 2008, and the following forms filed by Wherify: a Form 10–KSB for the year ended June 30, 2006, a Form 10–KSB for the year ended June 30, 2007, and a Form 10–QSB for the quarter ended March 31, 2008.

**[\*47]** having a reasonable expectation, at the time of accrual, that it would ultimately receive the interest accrued.

We have yet to address 6 of the 34 portfolio companies that issued debentures or promissory notes on which YA Global both accrued and wrote off interest for 2009: Cobalis, Compass, Isonics, iVoice, MM2, and Titan. We address those remaining 6 portfolio companies below.

### A. *Cobalis*

YA Global's actions in accruing interest on its Cobalis debentures in January 2009 and writing off all accrued interest the following month show that, contrary to the claims of petitioners and their counsel, the accrual of interest during a year was not automatic and that evaluations of collectibility were made during the year. In particular, those actions show that YA Global had no reasonable doubt in January about the collectibility of the interest accrued on its Cobalis debentures but that, in the next month, it determined that payment of that interest was unlikely.

Petitioners' proposed finding 232 lists for Cobalis both the "going concern" and the "bankrupty/receivership" identifiable events. The evidence of those circumstances to which petitioners point us does not call into question the judgments reflected in YA Global's treatment of the interest accrued on its Cobalis debentures. Concerns about Cobalis's ability to continue as a going concern long predated January 2009. Yet those concerns did not prevent YA Global from accruing interest on its Cobalis debentures in that month. The bankruptcy proceedings involving Cobalis also predated January 2009. Petitioners point to no information about Cobalis's financial condition in January 2009 that, had it been available to YA Global's general partner, would have caused the general partner to conclude that there was reasonable doubt as to the collectibility of the interest that accrued on the Cobalis debentures in that month.

### B. *Compass*

Petitioners' proposed finding 232 lists for Compass only the "bankruptcy/receivership" identifiable event. To demonstrate that Compass was in "bankruptcy or similar proceedings," petitioners cite the April 22, 2009, "Circular to Creditors" prepared by Compass's administrator. We infer that YA Global, as a major creditor of Compass, was well aware of the commencement of Compass's voluntary administration proceedings on January 29, 2009. Nonetheless, the

**[*48]** partnership continued to accrue interest on its Compass debentures through May 2009, demonstrating that the partnership's general partner judged that, at that time, no reasonable doubt existed as to the collectibility of the accrued interest. Petitioners do not claim that any of the information provided to creditors in the April 22, 2009, circular was unknown to YA Global but, had it been known, would have affected its general partner's decision to continue the accrual of interest on the partnership's Compass debentures through May 2009. (Petitioners' proposed finding 232 does not cite any specific page or pages of the circular. They thus appear to cite the circular only to establish that Compass entered voluntary administration on January 29, 2009.)

C.    *Isonics*

Petitioners' proposed finding 232 lists for Isonics the "going concern" and "cash flow" identifiable events. The evidence of those circumstances to which petitioners direct us does not call into question the judgments reflected in YA Global's treatment of the interest accrued on its Isonics debentures and promissory notes. Given the going concern qualification included in the report of the company's auditors on its financial statements for the year ended April 30, 2008, YA Global's general partner had reason to know, in January 2009, of doubts about Isonics's ability to continue operations as a going concern. It also had reason to know of Isonics's cashflow problems. Those problems seem to have worsened between October 31, 2007, and October 31, 2008. But those worsening cashflow problems did not prevent YA Global from continuing to accrue interest on its Isonics debentures and promissory notes through November 2009. Petitioners point to no information about Isonics's financial condition between January and November 2009 that, had it been available to YA Global's general partner, would have caused the general partner to conclude that reasonable doubt existed as to the collectibility of the interest on the Isonics debentures and promissory notes that accrued during those months.

D.    *iVoice*

The partnership's reporting of interest on its iVoice debenture, accruing interest from January through May 2009, ceasing accrual between June and October, and then writing off accrued interest in November, shows the partnership had no reasonable doubt about the collectibility of the accrued interest until June 2009.

**[\*49]** Petitioners' proposed finding 232 lists for iVoice the "going concern" and "cash flow" identifiable events. The evidence of those circumstances to which petitioners direct us does not call into question the judgments reflected in YA Global's treatment of the interest accrued on its iVoice debenture. Although iVoice Technology's 2008 Form 10–K, iVoice's September 30, 2009, Form 10–Q, and B Green's 2009 Form 10–K reported doubts about the company's ability to continue as a going concern, those doubts were not new. They dated back at least to 2007. In the face of those doubts about the ability of iVoice and iVoice Technology to continue as going concerns, and in the face of their "historical negative cash flow," YA Global continued to accrue interest on its iVoice debenture through May 2009. We are not convinced that the judgment reflected in that accounting was based on incomplete information about iVoice's financial condition between January and May of 2009.

### E. *MM2*

The partnership's reporting of accrued interest on its MM2 debentures shows that it had no reasonable doubt about the collectibility of the interest accrued on its MM2 debentures until December 2009.

Petitioners' proposed finding 232 lists for MM2 the "going concern," "default," and "cash flow" identifiable events. The evidence of those circumstances to which petitioners direct us does not call into question the judgments reflected in YA Global's accrual of interest on its MM2 debentures through November 2009. The factors cited in MM2's Form 10–Q for the quarter ended March 31, 2009, that led to doubt about the company's ability to continue as a going concern—losses and deficiencies in cashflow—did not arise for the first time during that quarter. Moreover, even after YA Global would have had access to the information disclosed in MM2's March 31, 2009, Form 10–Q, the partnership continued to accrue interest on its MM2 debentures. And, of course, YA Global would have been well aware of MM2's default on the repayment terms of one of those debentures. We are thus not convinced that the judgment reflected in YA Global's accrual of interest on its MM2 debentures between January and November 2009 was based on incomplete information about MM2's financial condition during those months.

**[\*50]** F.    *Titan*

Petitioners' proposed finding 232 lists for Titan only the "cash flow" identifiable event. Petitioners cite the Consolidated Statements of Cash Flows included in Titan's Form 10–Q for the quarter ended November 30, 2008. Those statements report that Titan had negative cashflow from operations for the three months ended November 30, 2007, but positive cashflow for the three months ended November 30, 2008. We fail to see how those statements call into question the determination made by YA Global's general partner that no reasonable doubt existed as to the collectibility of interest on the partnership's Titan debenture through November 2009.

Petitioners have not presented evidence unavailable to YA Global's general partner during 2009 as the partnership accrued interest that establishes that the partnership should have had no reasonable expectation, when the interest accrued, of ultimately receiving it. Of the 34 portfolio companies that issued debentures or promissory notes on which YA Global accrued and wrote off interest for 2009, 9 receive no mention in petitioners' Briefs. Petitioners mention another 6 of those 34 portfolio companies only in passing and do not call to our attention any evidence in the record of the financial condition of those companies. Petitioners *do* refer us to evidence of the financial condition of 19 of the portfolio companies that issued debentures or promissory notes on which YA Global accrued and wrote off interest for 2009. For 13 of those 19 portfolio companies, that evidence consists of one or more securities law filings that cover periods ended on or before September 30, 2008. Again, we assume that any information reported in those filings about the financial condition of those 13 portfolio companies was known to YA Global's general partner when it decided to accrue interest in 2009 on the debentures and promissory notes issued by those portfolio companies. As to the remaining 6 portfolio companies, the evidence to which petitioners point does not call into question YA Global's reporting of interest accrued on debentures or promissory notes issued by those companies. Therefore, we conclude that YA Global did not overstate its interest income for 2009 by $17,137,938. Instead, the partnership's interest income was $42,617,464, as stated on its 2009 Schedule K. That interest income should be included as an element of the partnership's ordinary business income for the year.

It follows from our resolution of the issues remaining that YA Global had ordinary business income for 2009 of $24,790,341, as determined in the FPAA. Under the analysis described in our prior

**[\*51]** opinion, all of that ordinary business income was effectively connected with YA Global's U.S. trade or business. YA Global owed section 1446 withholding tax, in an amount to be determined by the parties under Rule 155, on that portion of its 2009 ECTI allocable to the Foreign SPVs. Our resolution of the issues addressed in Parts I through IV should allow the parties to compute under Rule 155 YA Global's liabilities for additions to tax for 2009 under sections 6651(a)(1) and (2) and 6655.

*Decisions will be entered under Rule 155 for the taxable years 2009 through 2011.*